2025 UT App 92

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LUKE MARTIN BURANEK,
Appellant.

Opinion
No. 20230969-CA
Filed June 20, 2025

Second District Court, Ogden Department
The Honorable Craig Hall
The Honorable Rita M. Cornish
No. 221901265

Rachel Phillips Ainscough and Jessica Hyde Holzer,
Attorneys for Appellant

Derek E. Brown and Alexandra Herlong,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1 Over the course of one night, Luke Martin Buranek engaged in a sexually explicit online conversation and ultimately tried to meet up to have sex with a "13-year old girl" who turned out to be an undercover special agent. A jury subsequently convicted him of enticing a minor. Buranek now challenges his conviction, arguing that the trial court erred in denying his motion for a directed verdict on the ground that the State had failed to prove that he was not entrapped. We affirm his conviction.

## BACKGROUND[1]

¶2      In May 2022, having recently broken up with his girlfriend, Buranek posted an ad on a dating and personals website. The website required its users to be 18 years or older. Buranek's listing specified that he, a 19-year-old male, was seeking a "fwb situation"[2] and "connections" with women aged 18 to 35. The ad also included a picture of Buranek with blue hair.

¶3      The ad caught the attention of a special agent (Agent) for Utah's Internet Crimes Against Children Taskforce. Posing as a girl named Cassidy,[3] Agent responded to Buranek, leading to the following email exchange:

> Cassidy: I love the hair. You look like just my type. we should hang out
>
> Buranek: I'm willing. if I may ask what do you look like?
>
> Cassidy: I can send you a pic. I am a little young tho. I hope that is ok.

Agent then sent Buranek a photo of a girl whom Agent believed appeared to be around 13 years old but which was actually a photo of a legal secretary in Agent's office—sent with her

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Brown*, 2025 UT App 31, n.1, 566 P.3d 737 (quotation simplified).

2. As explained at trial, the abbreviation "fwb" stands for "'friends with benefits,' which is a no-strings attached relationship."

3. In this opinion, we sometimes refer to Agent by his undercover persona, "Cassidy."

consent—that was taken when she was between 15 and 17 years old.

¶4     The email exchange then continued:

> Buranek: What age are you?
>
> Buranek: I'm 19
>
> Cassidy: I am 13
>
> Cassidy: 19 is a great age for me. Mature yet understanding :)
>
> Buranek: I mean you're cute. but that age gap is real. I'm not a creep. what are you looking for exactly on here?
>
> Cassidy: looking to hang out. play video games and just chill. I am home alone and bored.

Buranek then asked whether Cassidy was on a certain messaging app, and the two exchanged a few more emails coordinating the switch to that other platform. Cassidy also sent Buranek two more photos that she said were of herself.

¶5     Once they had connected on the messaging app, Buranek sent a photo of himself, and their conversation continued:

> Buranek: You're very hot. You're very cute. Whatchu got in mind tonight?
>
> Cassidy: Play some video games. See where the night leads. What about you?
>
> Buranek: What games do you play? Where do you want the night to lead lmao

Cassidy: I just got Elden Ring.

Buranek: Elden Ring is very fun. Extremely hard tho. I'm almost at the ending.

Cassidy: Really. I need lots of help in it!! Where do you hope things lead to. I'm shy. You tell me first :)

Buranek: I'm pretty shy too so don't be worried, but we could make out at first and then it could lead where ever but I'm not gonna push any boundaries, I'm not a dick and I try to be a sweet guy so as far as you wanna take it ;) But no pressure ok

Cassidy: No pressure at all ;). That all sounds amazing. If I was willing. Where would you want it to lead too?

Buranek: How experienced are you? Like the furthest you've been?

Cassidy: I've only ever kissed a guy. It would be cool to have someone who has done stuff before lead me

Buranek: I could help but only if your alright with that. I don't wanna make you feel uncomfortable. I'd be gentle and sweet tho I assure you

Cassidy: I would be alright with it. What would you show me how to do?! It helps me Prepare. I'm shy, but love to hear what others have to say ;)

Buranek: I can show you the confidence you wanna show, how to transition into something like that. Or I could give you pleaser, so you know what it's like. I could help show you between a good guy and a

bad at it. I could show you the ropes. But I don't wanna do that if that's not what your looking for yk

Cassidy: That sounds so amazing. I would love that. You should come see me!

Buranek: I think I'm free.

¶6 Cassidy then asked Buranek to expand on "what kind of pleasure you can show me," to which he replied that he "could tease," "finger," or "please" her in whatever manner she felt "comfortable," and he assured her that he was not a "jerk." Cassidy then asked whether they "[c]ould go further" if she wanted and stated that Buranek seemed "so sweet and caring." Buranek answered, "Of course. Only if you want to." He also told her that he was "bigger than average." Cassidy then asked, "What would that be like. What would you do to me. Bigger than average?! Can I see?!" This prompted discussion of possibly exchanging nude photos, but they ultimately decided against it.

¶7 Their conversation then continued:

Cassidy: Maybe just tell me what going further than fingering and teasing would be like. I would love that.

Buranek: . . . . I love to please, I'd kiss your neck. Until you're ready.

Cassidy: Then?!

Buranek: Then we could do it however feels best for you. And it could be a learning experience for you

Cassidy: Like do it as in you'd wanna have sex with me :)

> Buranek: If that's what you want ;) But I could eat
> you out. How ever you want to enjoy me ;)
>
> Cassidy: I would love all that. If you still want to
> come and make a 13 year olds day I'd love to see
> you as soon as you could come. If not I totally get it.
>
> Buranek: I want to.

¶8     Buranek next wanted "reassurance that you are you" and asked Cassidy for more photos of her. Cassidy replied that she did not "feel comfortable sending any more" photos, but Buranek tried to convince her to do so anyway. After some back and forth, Cassidy suggested that they meet at a park near her house to ease his concerns and indicated that they could then go to her house if he wished. Buranek replied, "Sure. I'm game. Lemme take a shower real quick." When Buranek returned to the conversation after showering, he and Cassidy proceeded to coordinate meeting at the park.

¶9     After Buranek estimated that he could be there by 8:30 p.m., Cassidy clarified, "I just want to make sure your cool coming and meeting up with me to have sex and show me my first time" and asked, "You're still ok with meeting me even though I'm 13 and inexperienced at sex?" Buranek answered, "It's ok, I told you I'm not gonna judge. Just show you the ropes a little." Following additional coordination about their meet-up, which included Cassidy telling Buranek that her mother was out of town for the night and Buranek sending Cassidy a picture of his truck, Buranek left and drove some 40 minutes to meet her at the park.

¶10     Law enforcement officers arrested Buranek soon after his arrival at the park. He was charged with one count of enticing a minor, a second-degree felony. Buranek moved to have the charge dismissed on entrapment grounds. Following an evidentiary hearing, the trial court concluded that Agent's conduct did not constitute entrapment as a matter of law and denied the motion.

¶11    The case then proceeded to a two-day jury trial.[4] Agent was the only witness to testify for the State. Agent testified that he chose to respond to Buranek's ad because Buranek's "hair was something [Agent] could bring up in a conversation to chat with him about" and because the listing appeared to be "more sexual in nature." Agent stated that it is best practice for agents to state their undercover persona's age early in the conversation to not waste time with individuals who "cut bait and leave" after learning they are supposedly conversing with a minor. He indicated that it is also best practice to allow the other person to be the first to bring up sexual acts. Agent then testified about Cassidy's communications with Buranek, and the messages they exchanged were introduced into evidence.

¶12    Following Agent's testimony and the close of the State's evidence, Buranek moved for a directed verdict. He argued that the State had not met its burden of establishing that he was not entrapped. He noted that the website on which he posted his ad was "an adults only site," that the ad did not indicate that he sought to engage in "any sort of illegal activity," that Agent was the one to initiate contact with him, and that Agent engaged in "very persistent questioning" after Agent "had suggested sex." The State responded that entrapment had already "been litigated heavily prior to trial." The State also argued that entrapment focuses on the officer's actions and stated, "[T]he only evidence that we have right now up to this point is that [Agent] followed best practices in this conversation." The State further noted that Buranek had been repeatedly reminded that Cassidy was 13 years old, but he nonetheless discussed sexual acts with her.

---

4. Judge Craig Hall was assigned this case and presided over the pre-trial proceedings and the subsequent sentencing hearing. But because Judge Hall fell ill on the morning of trial, Judge Rita M. Cornish presided over the trial in his stead and ruled on Buranek's motion for a directed verdict, which is at issue in this appeal.

¶13 After commenting that "this is one of the closer cases," the trial court concluded that the State had presented sufficient evidence upon which a jury might reasonably base a finding that Buranek was not entrapped. The court stated that although there was "some emotional component to the conversation," an emotional plea "has to be . . . pretty significant" to amount to entrapment as a matter of law. Accordingly, the court denied the motion for a directed verdict.

¶14 In presenting his case, Buranek again raised entrapment as a defense. He called an expert witness, a former assistant U.S. Attorney and FBI agent, who opined, among other things, that Agent's methodology was flawed because Agent had not established a predisposition by Buranek to commit sexual crimes against minors prior to responding to his ad. The expert witness also stated that, in his estimation, the person pictured in the photographs Agent sent Buranek "doesn't look 13," and he opined that Agent "ramp[ed]" up the conversation on several occasions when the discussion turned to sex.

¶15 The jury found Buranek guilty of enticing a minor. He appeals.

ISSUE AND STANDARD OF REVIEW

¶16 Buranek challenges the trial court's denial of his motion for a directed verdict.[5] "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. "A defendant has a substantial burden on appeal to show that the trial court erred in denying a motion for directed verdict." *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (quotation simplified). Accordingly, "we will uphold a denial of the motion for directed verdict based on an insufficiency of the

---

5. Buranek does not appeal the trial court's earlier denial of his motion to dismiss on entrapment grounds.

evidence claim, if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified). Conversely, we will reverse the denial of a motion for directed verdict if, "when viewed in the light most favorable to the State, no evidence existed from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." *Id.* (quotation simplified).

## ANALYSIS

¶17    "The government is not permitted to engage in the manufacture of crime." *State v. Taylor*, 599 P.2d 496, 500 (Utah 1979). To that end, the Utah Code provides that the affirmative defense of entrapment is established

> when a peace officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it.

Utah Code Ann. § 76-2-303(1) (LexisNexis 2017). "Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." *Id.*

¶18    This statutory language expressly "incorporates an objective standard," *State v. Hatchett*, 2020 UT App 61, ¶ 11, 462 P.3d 1288 (quotation simplified), *cert. denied*, 470 P.3d 444 (Utah 2020), that "focuses on the conduct of the government agent, and whether that conduct included persuasion or inducement which would be effective to persuade an average person to commit the crime in question," *State v. Smith*, 2024 UT 13, ¶ 36, 548 P.3d 874

(quotation simplified). Nevertheless, although "the statutory test mainly examines the conduct of law enforcement, the defendant's responses to that conduct can be relevant to that inquiry." *Id.* ¶ 37. Accordingly, "the transactions leading up to the offense, the interaction between the agent and the defendant, and the response to the inducements of the agent, are all to be considered in judging what the effect of the governmental agent's conduct would be on a normal person." *Id.* (quotation simplified).

¶19 Most incidents of entrapment fall within two categories. *Id.* ¶ 38 & n.63. "The first category involves improper police conduct in which the government agent applied persistent pressure or persistently pursued the defendant to commit the crime." *Id.* ¶ 38 (quotation simplified). Our Supreme Court has found this category of entrapment in cases where the defendants gave noncommittal responses to undercover officers' requests to engage in illegal activity, following which the officers repeatedly contacted the defendants over the next several weeks, each time raising the subject of illegal activity until the defendants eventually gave in. *Id.* (citing *State v. Sprague*, 680 P.2d 404, 405-06 (Utah 1984); *State v. Kourbelas*, 621 P.2d 1238, 1238–39 (Utah 1980)). "The second category involves appeals based primarily on sympathy, pity, or close personal friendships, or offers of inordinate sums of money." *Id.* ¶ 39 (quotation simplified). Our Supreme Court has found that this category of entrapment occurred in a case in which the informant, who had previously been romantically involved with the defendant, "claimed to be going through painful withdrawals from heroin addiction, and pleaded for [the defendant's] help in finding drugs that would help alleviate her suffering." *Id.* (citing *Taylor*, 599 P.2d at 503–04).

¶20 On a motion to dismiss, "only when reasonable minds could not differ can the court find entrapment as a matter of law." *State v. Dickerson*, 2022 UT App 56, ¶ 21, 511 P.3d 1191 (quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022). Otherwise, the court must "allow the issue of entrapment to go to the jury." *Id.*

(quotation simplified). At trial, as with other affirmative defenses, once a defendant establishes a reasonable basis in the evidence for an entrapment defense, the burden shifts to the State to prove beyond a reasonable doubt that the defense is without merit. *See State v. Curtis*, 542 P.2d 744, 746 (Utah 1975); *State v. Campos*, 2013 UT App 213, ¶ 41, 309 P.3d 1160, *cert. denied*, 320 P.3d 676 (Utah 2014); *State v. Sellers*, 2011 UT App 38, ¶ 15, 248 P.3d 70. *See also* Utah Code Ann. § 76-1-502(2)(b) (LexisNexis 2017) (requiring the State to disprove an affirmative defense). That is, the State must prove beyond a reasonable doubt that the government agent's conduct "merely afford[ed]" the defendant an "opportunity to commit an offense" rather than creating "a substantial risk that the offense would be committed by one not otherwise ready to commit it." Utah Code Ann. § 76-2-303(1).

¶21 Buranek challenges the denial of his motion for a directed verdict based on entrapment. In this context, we will affirm the trial court's denial of the directed verdict "if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find" beyond a reasonable doubt that Buranek had not been entrapped. *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (quotation simplified).

¶22 Buranek argues that the court erred in considering only whether Agent's actions fell within the emotional entrapment category, the second of the two entrapment categories, and not also whether his actions constituted consistent pressure that induced him to commit the offense under the first category. Specifically, he asserts that "Agent's actions in initiating contact with [him] via a legal listing and repeatedly pressing [him]—despite his hesitancy—to provide Agent with sexual details, did not merely provide [him] an opportunity to commit enticement" but rather "*created* a substantial risk that the offense would be committed by [him] as one not otherwise ready to commit it." In support of this argument, Buranek points to the fact that Agent, posing as 13-year-old Cassidy, answered an ad that sought

connection with women aged 18 to 35. He also points to the following messages Agent sent as constituting persistent pressure:

- I love the hair. You look like just my type. we should hang out

- Where do you hope things lead to. I'm shy. You tell me first :)

- No pressure at all ;). That all sounds amazing. If I was willing. Where would you want it to lead too?

- I've only ever kissed a guy. It would be cool to have someone who has done stuff before lead me

- I would be alright with it. What would you show me how to do?! It helps me Prepare. I'm shy, but love to hear what others have to say ;)

- That sounds so amazing. I would love that. You should come see me!

- I want to know what kind of pleasure you can show me.

- That all sounds amazing. Could we go further if I wanted too? You sound so sweet and caring.

- What would that be like. What would you do to me. Bigger than average?! Can I see?!

- Maybe just tell me what going further than fingering and teasing would be like. I would love that.

- Then?!

- Like do it as in you'd wanna have sex with me :)

¶23 But a "defendant's reactions to the government inducement—for example, whether the defendant hesitates when presented with an illegal opportunity and succumbs only to persistent pressure or, conversely, whether the defendant actively pursues the commission of the crime despite opportunities to withdraw—are highly relevant to the statutory question of whether the police methods created a substantial risk that the offense would be committed by one not otherwise ready to commit it." *Dickerson*, 2022 UT App 56, ¶ 34 (quotation simplified). *See State v. Smith*, 2024 UT 13, ¶ 37, 548 P.3d 874 (stating that "the response to the inducements of the agent" is a relevant consideration when "judging what the effect of the governmental agent's conduct would be on a normal person") (quotation simplified). And upon review of the conversation between Buranek and Cassidy as a whole, it is readily apparent that Buranek needed very little inducement before he began engaging in a sexually explicit conversation with a person whom he believed to be a 13-year-old girl and whom he ultimately arranged to meet to have a sexual encounter with.

¶24 Although Cassidy's first message stated that Buranek looked "like just [her] type" and suggested that they "should hang out," Cassidy also quickly informed Buranek that she was 13. Buranek first expressed some hesitancy upon learning her age. After stating that the "age gap is real" and that he was "not a creep," he asked what she was "looking for exactly." Cassidy answered that she was "looking to hang out," "play video games and just chill"—nothing inherently sexual. It was at that point that Buranek suggested that they continue their conversation on a messaging app, and in his first message to her on that other platform, he told her that she was "very hot" and "very cute." He also asked, "Whatchu got in mind tonight?" These comments could be interpreted to signal sexual interest. When Cassidy noncommittally responded that she planned to play a video game and "[s]ee where the night leads," Buranek asked where she wanted the night to lead. After Cassidy asked him to "tell [her]

first," Buranek answered that they "could make out at first and then it could lead where ever." Cassidy then asked, if she was willing, where he wanted "it to lead." From there, the conversation became more explicitly sexual in nature with very little effort from Agent—effort that certainly fell short of conduct that would induce one otherwise not ready to commit the offense. In sum, after Buranek learned Cassidy's age, he was the first to express a sexual interest when he called her "very hot," followed immediately by the inquiry of what she had "in mind" for the night. Cassidy said nothing to prompt Buranek to stray from his initial, rather momentary, hesitancy. And from that point onward, Buranek readily responded to any messages of a sexual nature that Cassidy sent.

¶25 Additionally, the culmination of the conversation, i.e., Buranek attempting to meet Cassidy for a sexual encounter, all occurred during the course of a single night—not over the course of several weeks' worth of contact as in the cases in which our Supreme Court has previously concluded that entrapment occurred as a matter of law. *See Smith*, 2024 UT 13, ¶ 38 (citing *Sprague*, 680 P.2d at 405–06; *Kourbelas*, 621 P.2d at 1238–39). Moreover, Agent also gave Buranek several opportunities to disengage, reminding him more than once that Cassidy was 13 and asking whether he was "cool" "to have sex and show [Cassidy her] first time" and whether he was "still ok" meeting with an "inexperienced" 13-year-old to have sex. Buranek also had the opportunity to withdraw when he left the conversation to take a shower and during the 40-minute drive to the park to meet Cassidy. *See Dickerson*, 2022 UT App 56, ¶ 34 (stating that "whether the defendant actively pursues the commission of the crime despite opportunities to withdraw" is "highly relevant" to the entrapment inquiry).

¶26 All this evidence was sufficient to withstand a motion for a directed verdict. When viewed in the light most favorable to the State, the evidence showed that Agent's conduct did not

"include[] persuasion or inducement which would be effective to persuade an average person" to entice Cassidy to have sex, *Smith*, 2024 UT 13, ¶ 36 (quotation simplified)—rather, the evidence showed that Agent "merely afford[ed]" Buranek an "opportunity to commit [the] offense," Utah Code Ann. § 76-2-303(1).

## CONCLUSION

¶27  The conversation between Buranek and Cassidy was sufficient evidence to withstand Buranek's motion for a directed verdict. Accordingly, we affirm his conviction.

_____