2025 UT App 111

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROY BENJAMIN LEVERING,
Appellant.

Opinion
No. 20221004-CA
Filed July 17, 2025

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 191502172

K. Andrew Fitzgerald,
Attorney for Appellant

Derek E. Brown and Connor Nelson,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1     Police found marijuana, methamphetamine, and drug paraphernalia in Roy Benjamin Levering's vehicle during a traffic stop. He was charged with possession of a controlled substance with intent to distribute, tampering with evidence, possession or use of a controlled substance, and possession of drug paraphernalia. After initially being appointed counsel (Counsel), Levering decided to represent himself and proceeded at trial pro se. A jury convicted him on all four counts. He now appeals, asserting that he did not knowingly and intelligently waive his right to counsel, that his sentence was improperly enhanced, and that the trial court failed to consider mitigating factors in sentencing. We affirm.

## BACKGROUND[1]

*Levering's Arrest*

¶2     On November 12, 2019, a K-9 deputy with the Washington County Sheriff's Office (Deputy) was on patrol when he saw a vehicle with a burned out headlight driving toward him. Deputy decided to stop the vehicle to let the driver know about the light. Levering was the driver and only occupant. Deputy told Levering about his headlight and said he would give him a warning.

¶3     As Levering was getting his identification, Deputy noticed Levering's hand was shaking. Deputy went back to his vehicle to run Levering's driver license and license plate. From his vehicle, Deputy saw Levering reaching underneath his seat in the direction of the center console. Deputy testified at trial that this was common for someone trying to conceal something they do not want an officer to see. Deputy asked Levering to step out of his vehicle to finish the warning. Deputy deployed his K-9 "to conduct an exterior sniff of the vehicle" based on his suspicions that Levering was potentially concealing weapons or drugs in his vehicle. The K-9 alerted on Levering's car.

¶4     Deputy told Levering that he was going to conduct a probable cause search because of the dog's alert. Inside the car, Deputy found a plastic baggie containing a white crystalline substance, the bowl piece of a marijuana pipe that contained burned residue and smelled like marijuana, "the actual bong portion" of the marijuana pipe that was attached to a methamphetamine bowl, a small glass jar with a "small amount of marijuana," and a lemonade container that had two baggies

---

1. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Herrera*, 2025 UT App 1, n.2, 563 P.3d 416. (cleaned up).

filled with a white substance and marijuana in a secret compartment. Deputy also found a pill bottle underneath the driver's seat. Deputy then arrested Levering and transported him to the county jail.

¶5    Once Levering exited the Deputy's vehicle at the jail, Deputy checked it to make sure there was not anything left inside that the K-9 could eat. Deputy found two large bags of what he believed was methamphetamine. Later, Deputy downloaded his body camera, "prisoner seat" camera, and dash camera footage. The prisoner seat footage showed Levering "shoving his hands down his pants," while still handcuffed, but he stopped when Deputy approached the vehicle. Once Deputy moved away from the vehicle, Levering "again shoved his hands down his pants and removed a large item" "which he put behind his back" before it audibly "hit the floor."

¶6    Levering was charged with possession of a controlled substance with intent to distribute methamphetamine, tampering with evidence, possession or use of a controlled substance, marijuana, and possession of drug paraphernalia (the 2019 case).

*Levering's Appointed Counsel and Self-representation*

¶7    The court appointed Counsel to represent Levering, and he performed numerous tasks on Levering's behalf. He filed a competency petition,[2] participated in plea negotiations, obtained discovery from the State, and cross-examined the State's witness at the preliminary hearing. Counsel was also appointed to represent Levering in a later case (the 2022 case).

¶8    At various points, Levering expressed that he no longer wanted Counsel to represent him. At the arraignment hearing for a third, unrelated case—at which Counsel appeared because the

---

2. The court granted the petition, but no competency evaluation occurred because Levering was "not willing to comply."

2019 case and the 2022 case were also calendared—the following exchange occurred:

> THE COURT: All right. So, Mr. Levering, there are three cases. . . . Are you going to try and hire an attorney on the newest case, sir?
>
> . . . .
>
> LEVERING: I will be standing sui juris in propria persona on that, representing myself.
>
> THE COURT: So you want to represent yourself on the new case, correct?
>
> LEVERING: Yes.
>
> THE COURT: And are you going to continue to have [Counsel] represent you on the 2019 case and the earlier 2022 case?
>
> LEVERING: . . . I believe that I'll be standing sui juris on all cases.

¶9     Then, at the next hearing, Counsel informed the court that Levering told him he had a new attorney. The court asked who the attorney was, and Levering gave a first name and requested more time to figure out the "details" with his new attorney. The court noted that Levering had "the right to hire [his] own attorney" but that because that attorney had yet to make an appearance, Counsel would remain as Levering's counsel. The court said, "You can choose to proceed without counsel if you want. But [with] the . . . case[] being three years old, I'm putting it on a trial calendar."

¶10    At a pretrial conference for the 2019 case, the court indicated, "Levering is choosing to represent himself, but I've appointed [Counsel] as back-up counsel." Levering was not present because he had difficulty logging in to the virtual hearing. The court continued the case to the next week.

¶11    Levering appeared at the next pretrial conference; Counsel was also present. Levering orally moved the court to "globalize" all three of his cases. The court told Levering the State would have to agree and noted that the court "would not be inclined to have all those cases put together." Levering then orally moved for a continuance because he needed "the full discovery" to "have a proper defense." Counsel informed the court that he had no issues receiving discovery. The court denied the continuance. Levering again asked for a continuance, which the court denied.

¶12    At the next pretrial conference, the court engaged in the following colloquy with Levering:

> THE COURT: I want to make sure that you understand what you're doing in representing yourself. I think I may have gone through this before, but I want to be sure. And so bear with me. I may be plowing some old ground.
>
> I think I've asked you if you studied law before, and you said that you've been doing it recently, correct?
>
> LEVERING: Correct.
>
> THE COURT: Have you ever represented yourself or anyone else in a criminal action?
>
> LEVERING: I have never presented myself, but I believe and I'm confident that I can.

THE COURT: You realize that you are charged with crimes. And I need to let you know the case is going to trial. It is a first-degree felony possession with intent to distribute a controlled substance.

You need to understand that a first-degree felony, if you're found guilty, my hands are tied. You would be sentenced to five years to life in the Utah State Prison, with a $10,000 fine. It would be up to the Board of Pardons to determine how long you actually serve, but it would be a five-year minimum.

You would also be going to court on a class A misdemeanor, tampering with evidence. That could lead to a one-year jail sentence and up to a $2,500 fine. You'd also be going to court on a class B misdemeanor that could result in 180 days in jail and a $1,000 fine. Those cases—those charges could run consecutively. You need to understand that.

If you are found guilty, you would still have two cases that would need to be taken care of, both third-degree felony possession cases. A third-degree felony could result in a zero to five years in the Utah State Prison, a $5,000 fine . . . . You're swimming in deep water . . . . I just need to make you aware that those are the results of what could happen when we go to trial.

LEVERING: I do comprehend that. . . .

THE COURT: You realize that if you represent yourself, you are on your own. I can't tell you how to try your case. I can't advise you on how to try your case. You are going to have back-up counsel, but you will be the one representing yourself.

Are you familiar with the Rules of Evidence?

LEVERING: Not too familiar with it. I'm actually studying on it now. These are the reasons that I requested a little extension on that so that I have a little more time to prepare a proper case. You denied that which I don't feel is fair. But yes, I am aware.

THE COURT: Okay. And you'll be expected to abide by those rules. Are you familiar with the Rules of Criminal Procedure?

LEVERING: I am.

THE COURT: And you realize that those rules will govern the way in which this criminal action is tried, correct?

LEVERING: Well, I'm trying to file a motion to have it in . . . a higher court. If that is awarded, I would prefer to . . . have a proceeding and all of this taken care of in that court.

THE COURT: Sure. Understand that a higher court . . . would review the case if you are . . . found guilty . . . and you wanted to appeal. But this is the Court that tries cases in the State of Utah for the crimes you've been charged with.

You can file your motion, but as close as it is to trial, I'll hear it, but I'm not sure that I'd be acting on it at all.

So let me move on. If you decide to take the witness stand, you are going to have to present your testimony by asking yourself questions and then

giving yourself an answer. I'm not going to allow you to simply stand up and start telling a story.

The attorneys have to ask questions and get an answer to the witness on the stand. And if you represent yourself, you're going to have to do that same thing. So you're going to have to prepare questions for yourself. Then the State can object if the question is inappropriate. And if not, then you would give yourself an answer. It's an unwieldly practice, but you've got the right to represent yourself. But I'll expect you to go through that process, okay?

LEVERING: Well, this is the reason that I can't represent myself. I can't represent myself. I have to present my case. And that can only be done by presenting it.

I corrected my status, and I'm no longer a 13—14th Amendment citizen. Pardon me. I'm a state national, and I do have the assembly behind me on this. So yes, I suppose I understand what you're saying with that part—comprehend what you're saying with that. It doesn't seem feasible to represent myself. I can't do that. I have to present the case.

And the situation in which it is, it's very – it hasn't been pleasant, to say the least, with the officers, with the— it has not been fun. But I'm not going to get into that now because I know you're not going to hear that. But yes, I need to present my case.

THE COURT: And you can present your case, but you're going to do it pursuant to the Rules of

Evidence and the Rules of Criminal Procedure, which is you ask yourself a question. You are put under oath. You ask yourself a question. You wait to see . . . if the State has an objection and then you give the answer.

You've got the right to tell that to an attorney, but you're going to do it on the same rules and procedures that the State is forced to do. I wouldn't allow them to disregard those rules. If you're representing yourself, I'll expect you to follow those rules as well.

So let me just say. In my opinion, you'd be far better served if you were defended by a trained lawyer rather than yourself. It's unwise to try and represent yourself. You're not familiar with the law. You're not familiar with court procedure. You're not familiar with the Rules of Evidence. I strongly urge you not to try to represent yourself.

We've kind of gone through this. You tell me that you will represent or present yourself. . . . I'm appointing [Counsel] as back-up counsel, but he's only there to help you if you ask for it. I'm not going to let him try the case and tell you what to do next. It's going to be up to you.

And, again, if you're found guilty, sentencing will be basically out of my hands. You will go to prison from five years to life. Then we will also have to deal with the other third-degree felonies at some point.

¶13   At the final pretrial conference on September 20, 2022, the court denied several motions filed by Levering and ended the hearing by stating, "[Y]ou are swimming in deep water. But if

you're representing yourself, you are telling me that you understand criminal procedure, you understand the Rules of Evidence, and you are expected to know, when pretrial exhibits are made, to follow up with those."

## *Levering's Trial*

¶14 A jury trial began at 9:00 a.m. on September 21, 2022. Levering did not appear and, after waiting a short time, the trial court began jury selection without him. The court then proceeded with jury instructions, also without Levering present. At 1:20 p.m., Levering finally arrived. Outside the presence of the jury, Levering said he was late because he was "put in a situation where [he] didn't have the time to get . . . things notarized that needed to come with [him] today," and he had a flat tire. Levering apologized, explaining that he had never been late before and that he does not miss court. The jury returned to the courtroom, and Levering declined to give an opening argument.

¶15 Deputy testified on behalf of the State as to the traffic stop and search of Levering's vehicle, along with two forensic scientists who tested the items found in Levering's vehicle. The State played the video footage of Levering removing the bags that were on his person. Levering called no witnesses. In his closing argument, Levering stated that he lent his car to some friends and that the items in the car were theirs. He also expressed it would have been hard for him to move anything from his person while in Deputy's vehicle because his hands were cuffed behind his back. The jury found Levering guilty on all four counts.

## *Levering's Sentencing*

¶16 Levering asked Counsel to represent him at sentencing, which the court allowed. The State argued that Levering's sentence for possession of a controlled substance with intent to distribute methamphetamine should be enhanced because he had pleaded guilty in 2004 to attempted possession of marijuana with

intent to distribute. *See* Utah Code § 58-37-8. Counsel argued that because marijuana and methamphetamine "are dealt with in separate subsections" under the enhancement statute, the sentence should only be enhanced if there is a second conviction "for the same level, either Schedule I or II or for marijuana if that were the case." The court agreed with the State's reading of the statute but noted Counsel's argument was "a very interesting point that probably should be looked at by a higher court."

¶17   Counsel then asked the court to order Levering to participate in Adult Recovery Court. Counsel explained that while Levering currently had several cases, there was an eight-year gap from 2006 to 2014 with no charges. Counsel argued that Levering was only facing imprisonment because of the enhancement and if it was a second-degree felony, as originally charged, Levering would be facing jail as an initial condition of probation. Thus, Counsel asked the court to depart from the presentence investigation report, which recommended prison, and sentence him to either Adult Recovery Court or jail. In response, the State asked the court "to follow the presentence investigation."

¶18   After hearing arguments from both sides, the court stated, "I've been troubled by this case. . . . [Y]ou've been in front of me a number of times . . . . [A]nd it's always drug-related." The court declined to order Levering to participate in Adult Recovery Court because Levering had declined to do so prior to trial and "it's too late now to ask for it." The court continued, "[A]s far as I'm concerned, you did yourself a very great disfavor by representing yourself." The court then acknowledged that Levering had "an eight-year period of no legal problems." However, the court observed that since Levering had lived in St. George, he had cases almost yearly. The court went over these cases with Levering, saying, "[Y]ou're not a clean one-owner here. Your life has been spent in violation of the law. And at some point, society should be protected from someone who acts, I believe, like you have." The

court sentenced Levering to five years to life in the Utah State Prison. The court noted that it did think a life term would be too much and observed that even five years may be too much, but it concluded that Levering did "deserve prison."

ISSUES AND STANDARDS OF REVIEW

¶19    Levering first argues that he did not knowingly and voluntarily waive his constitutional right to counsel. "Whether a defendant's waiver was knowing and intelligent involves a mixed question of law and fact which we review for correctness, but with a reasonable measure of discretion given to the trial court's application of the facts to the law." *State v. Lee*, 2024 UT App 2, ¶ 7, 542 P.3d 974 (cleaned up).

¶20    Levering next asserts that the trial court erred in interpreting Utah Code section 58-37-8 in concluding that the enhancement for distribution of a controlled substance based on a prior conviction applied here. "The interpretation of a statute presents a question of law that we review for correctness." *State v. Wood*, 2023 UT 15, ¶ 14, 532 P.3d 997 (cleaned up).

¶21    Finally, Levering argues that the trial court erred in not considering mitigating factors at sentencing. "[Trial] courts are afforded wide latitude in sentencing, and we will reverse a sentencing decision only if the court abused its discretion." *State v. Robinson*, 2018 UT App 227, ¶ 13, 438 P.3d 35. "This court reviews the sentencing decisions to discover any abuse of discretion by applying varying standards of review consistent with the issues raised. For questions of law, we employ a correctness standard. We review questions of fact for clear error." *Id.* (cleaned up).

ANALYSIS

I. Self-representation Colloquy

¶22    "Under both the United States and Utah Constitutions, a criminal defendant has the right to assistance of counsel." *State v. West*, 2023 UT App 61, ¶ 27, 532 P.3d 114 (cleaned up). And "concomitant with that right is the criminal defendant's guaranteed right to elect to present one's own defense." *Id.* (cleaned up). "The right to counsel and the right to waive counsel are mutually exclusive," and therefore, "a trial court must be vigilant to assure that the choice to waive counsel is freely and expressly made with eyes open." *Id.* (cleaned up). "Because pro se defendants may often find themselves at a serious disadvantage in our legal system, it is the solemn duty of the trial court to ensure defendants exercise their right of self-representation voluntarily, knowingly, and intelligently." *State v. Lee*, 2024 UT App 2, ¶ 9, 542 P.3d 974 (cleaned up). "The best way to ascertain if a defendant has the requisite knowledge of the legal mire they wish to wade into is for a court to engage in penetrating questioning through a colloquy on the record." *Id.* (cleaned up).

¶23    In *State v. Frampton*, 737 P.2d 183 (Utah 1987), our supreme court provided a model colloquy of sixteen questions to guide trial courts in ensuring a defendant's waiver of counsel is made voluntarily, knowingly, and intelligently. *Id.* at 187 n.12 (quoting 1 Fed. Jud. Ctr., *Benchbook for U.S. District Court Judges*, §§ 1.02-2 to -5 (3d ed. 1986)). Though compliance with the *Frampton* colloquy "is not mandatory" and its phrasing is "not talismanic," *State v. Waterfield*, 2014 UT App 67, ¶ 20, 322 P.3d 1194, the "colloquy on the record [is] the preferred method of determining whether a defendant is aware of" the "dangers and disadvantages of self-representation," *State v. Pedockie*, 2006 UT 28, ¶ 42, 137 P.3d 716 (cleaned up). Absent a complete colloquy, we "look at any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se," *Frampton*, 737 P.2d

at 187, with the validity of the waiver "assessed *at the time of the alleged waiver*," *Lee*, 2024 UT App 2, ¶ 12 (cleaned up).

¶24 Although the trial court conducted most of the *Frampton* colloquy here, it was nonetheless incomplete. The court did not ask the last three questions, which include confirming the defendant still "desire[s] to represent [him]self and to give up [his] right to be represented by a lawyer," confirming the decision is "entirely voluntary," and "find[ing] that the defendant has knowingly and voluntarily waived his right to counsel." *Frampton*, 737 P.2d at 188 n.12 (cleaned up). Thus, we look at the record de novo to determine whether there is sufficient evidence to show that, at the time of the waiver, Levering was actually aware of the risks of proceeding pro se. *Id.* at 188.

¶25 Levering first asserts he was unaware of his right to counsel because at the end of the colloquy the court failed "to point out that he was constitutionally entitled to court-appointed counsel" and ask him whether the colloquy had made him change his mind. However, the record demonstrates that Levering was informed of, and understood, his right to counsel.

¶26 During the colloquy, the court told Levering he would have to "abide by" the court rules and said, "[I]f you represent yourself, you are on your own." Levering told the court he was studying the law and the Utah Rules of Evidence and was familiar with the Utah Rules of Criminal Procedure. And at the end of the colloquy, the trial court warned Levering he would be "far better served if [he was] defended by a trained lawyer rather than" himself. Considering all of this together, it was sufficient to put Levering on notice that he had the right to counsel.

¶27 Yet, Levering argues the colloquy caused him to change his mind about representing himself and if the court had only asked him at the end of the colloquy whether he still wished to do so, he would have declined. As evidence that Levering no longer wished to represent himself, he directs us to where he stated mid-

colloquy, "Well, this is the reason that I can't *represent* myself. I can't *represent* myself. I have to *present* my case. And that can only be done by *presenting* it." (Emphasis added.) But Levering fails to acknowledge that his use of the term "represent" did not mean that he did not want to proceed pro se. Rather, Levering used the term "represent" in connection with his assertion that he is a "state national."[3] Levering explained, "It doesn't seem feasible to *represent* myself. I can't do that. I have to *present* the case." (Emphasis added.) And at his sentencing hearing, Levering clarified that he did "not want representation" because he was "presenting [his] case . . . not representing it."[4] Levering drew a clear distinction between "representing" and "presenting" numerous times in the record.[5] And when viewed in the full context, it is clear that Levering's understanding of "presenting his case" is akin to representing himself pro se.

---

3. "American State National is a term commonly used by Sovereign Citizens to identify themselves as individuals who do not believe they are citizens of what they perceive as an illegitimate government." *Bollin v. State*, No. 10-23-00414-CR, 2024 WL 4163649, at *1 (Tex. App. Sept. 12, 2024) (cleaned up). Regardless of what a defendant calls himself, sovereign citizen ideology "has no conceivable validity in American law." *Charlotte v. Hansen*, 433 F. App'x 660, 661 (10th Cir. 2011) (cleaned up).

4. Though these statements occurred after the colloquy, we include them here for added context about what Levering understood "representing" and "presenting" to mean.

5. The State suggests that Levering "emphasizing 'present' over 'represent' may . . . be an example of how some sovereign citizens differentiate certain words to enforce their conception of legal rights." (Citing Caesar Kalinowski, *A Legal Response to the Sovereign Citizen Movement*, 80 Mont. L. Rev. 153, 160–70 (2019).)

¶28 Furthermore, Levering understood the value of being represented by counsel. *See State v. West*, 2023 UT App 61, ¶ 36, 532 P.3d 114 (holding that it was unclear whether the defendant "understood the associated value of having the assistance of counsel"). In *State v. Lee*, 2024 UT App 2, 542 P.3d 974, the defendant retained his own counsel. *Id.* ¶ 3. His counsel filed a discovery request and appeared at his arraignment, where the defendant informed the court he no longer wanted counsel and would represent himself. *Id.* Finding the trial court's colloquy inadequate, this court reviewed the record de novo and was not convinced that the defendant knowingly and voluntarily waived his right to counsel. *Id.* ¶¶ 11, 18. Specifically, we noted that the work the defendant's counsel performed before his waiver did not "inform[] him of the value of counsel" because the defendant dismissed his counsel "almost immediately at his arraignment" after she filed only one discovery request. *Id.* ¶ 15.

¶29 Unlike the defendant in *Lee*—who only had the benefit of counsel very briefly—Levering had the benefit of representation by Counsel from November 2019 until August 2022. During his nearly three years representing Levering, Counsel participated in plea negotiations, discovery, several pretrial conferences, and a preliminary hearing, where Counsel cross-examined the State's witness. Thus, Levering had witnessed Counsel represent him and was able to understand "the value of representation." *Id.*; *West*, 2023 UT App 61, ¶ 36.

¶30 Levering also asserts that his waiver of the right to counsel was ineffective because the trial court failed to make a finding on the record that he knowingly and voluntarily waived his constitutional right to counsel. While making such a finding may be the best course, *see State v. Frampton*, 737 P.2d 183, 187 n.12 (Utah 1987), it is not required for a waiver of the right to counsel to be effective. "[W]hether a knowing and intelligent waiver has been made turns upon the particular facts and circumstances surrounding each case." *Id.* at 188. Here, the "record adequately

supports the conclusion that [Levering] knowingly and intelligently waived the right to representation by counsel." *Id*. at 189.

¶31 The court engaged with Levering in an extensive, if incomplete, colloquy about his request to waive his right to counsel that spanned five pages of the transcript. *See supra* ¶ 12. In that exchange with the court, Levering stated that he "believe[d] and [was] confident" that he could represent himself. And Levering told the court that he understood he had to follow the rules and procedures for trial. Levering also told the court multiple times that he understood he had to "present" his case to the jury. Additionally, Levering requested to represent himself in all three of his cases. It is therefore apparent from the record that Levering waived his right to counsel knowingly and intelligently.

¶32 Accordingly, after reviewing the record de novo, we conclude that Levering's waiver of his right to counsel was made voluntarily, knowingly, and intelligently, and he proceeded pro se with his "eyes open." *West*, 2023 UT App 61, ¶ 27 (cleaned up).

## II. Sentencing Enhancement

¶33 As relevant to this appeal, Utah Code section 58-37-8 provides that "it is unlawful for a person to knowingly and intentionally . . . possess a controlled . . . substance with intent to distribute." Utah Code § 58-37-8(1)(a).[6] "A person convicted of violating Subsection (1)(a) with respect to" a Schedule I or II substance "is guilty of a second degree felony, . . . and upon a second or subsequent conviction is guilty of a first degree felony." *Id.* § 58-37-8(1)(b)(i). And a "person convicted of violating

---

6. Since Levering's conviction, the legislature has modified the words "any person" to "a person" in Utah Code section 58-37-8(1). *Compare* Utah Code § 58-37-8(1) (2025), *with id.* (2017). As this change is not material to our analysis, we cite the current version of the statute for convenience.

Subsection (1)(a) with respect to" a Schedule III or IV substance or marijuana, "is guilty of a third degree felony, and upon a second or subsequent conviction is guilty of a second degree felony." *Id.* § 58-37-8(1)(b)(ii). Here, Levering was convicted with respect to a Schedule I or II substance (methamphetamine).

¶34 Levering argues that the trial court improperly enhanced his conviction for possession of a controlled substance with intent to distribute methamphetamine based on his 2004 conviction for attempted distribution of marijuana. Levering asserts that his conviction should not have been enhanced because the enhancement only applies to convictions involving drugs in the same schedule, and marijuana is not a Schedule I or II substance like methamphetamine. We do not find merit in Levering's interpretation of the statute.

¶35 "When faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the Legislature." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). Because "the best evidence of the legislature's intent is the plain language of the statute itself," "when interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Id.* (cleaned up). We also "presume that the expression of one term should be interpreted as the exclusion of another." *Id.* (cleaned up). "We therefore seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." *Id.*

¶36 Section 58-37-8(1)(b) imposes different penalties for convictions involving different drugs. It does not, however, impose an enhancement based on which type of drugs were the subject of a prior conviction. Under section 58-37-8(1)(b)(i), a person convicted of "violating Subsection (1)(a)," which includes "possess[ing] a controlled or counterfeit substance with intent to distribute" is guilty of a second-degree felony "with respect to" a

Schedule I or II controlled substance. Utah Code § 58-37-8(1)(a)(iii), (b)(i). But "upon a second or subsequent conviction," the person is "guilty of a first degree felony." *Id*. § 58-37-8(1)(b)(i).

¶37 Levering argues that because subsection (1)(b) begins with the phrase "a person convicted of violating Subsection (1)(a) with respect to" and then differentiates the penalty by class of drug, the enhancement provision necessarily requires that the prior conviction involve the same level of drug before the enhancement applies. *Id*. § 58-37-8(1)(b). We disagree. If the legislature intended Levering's understanding of the statute to be correct, the language of the statute would be different. Subsection (1)(b)(i) would need to have specified that enhancement occurred upon a second or subsequent conviction *of a Schedule I or II substance* rather than just a "subsequent conviction." *Id*. § 58-37-8(1)(b)(i). The same is true for section 58-37-8(1)(b)(ii). A person convicted of possessing or distributing a Schedule III or IV substance or marijuana is guilty of a second-degree felony "upon a second or subsequent conviction." *Id*. § 58-37-8(1)(b)(ii). Again, for Levering's reading to be accurate, the legislature would have needed to include language that the enhancement occurred upon a second or subsequent conviction *of a Schedule III or IV substance or marijuana*. But the legislature did not include that language, and we assume that the omission was intentional.[7] *See Marion Energy, Inc.*, 2011 UT 50, ¶ 14.

¶38 Subsection (6) of section 58-37-8 further supports the propriety of the enhancement here. It states, "For purposes of penalty enhancement under Subsection[] (1) . . . , a plea of guilty

---

7. The penalties imposed for drug crimes are inherently a policy choice, and that choice belongs to the legislature. *See State v. Tapp*, 490 P.2d 334, 336 (Utah 1971) ("[I]t is the prerogative of the legislature, expressing the will of the people, to fix the penalties for crimes; and the courts should give effect to the enactment and the effective date thereof as so declared.").

or no contest to a violation or attempted violation of this section or a plea which is held in abeyance . . . is the equivalent of a conviction." Utah Code § 58-37-8(6)(a). Not only is this subsection relevant because Levering pleaded guilty to his 2004 marijuana charge, but it also demonstrates that the legislature intentionally left out the words in subsection (1)(b) necessary for Levering's argument to be correct. Subsection (6)(a) does not include a specific drug schedule. Rather, it states that pleas count as prior convictions without making any reference to the type of drug. Thus, in Levering's case, his prior plea means he has a conviction. Therefore, under subsection (1)(b), because Levering has a prior conviction and was convicted of methamphetamine charges here, his conviction was enhanced to a first-degree felony.

¶39  We therefore affirm the trial court's interpretation of the statute and its imposition of the enhancement of Levering's conviction for possession with intent to distribute to a first-degree felony.

### III. Mitigating Factors

¶40  "In general, a trial court's sentencing decision will not be overturned unless it exceeds statutory or constitutional limits, the judge failed to consider all the legally relevant factors, or the actions of the judge were so inherently unfair as to constitute abuse of discretion." *State v. Killpack*, 2008 UT 49, ¶ 59, 191 P.3d 17 (cleaned up), *abrogated on other grounds as recognized by State v. Lowther*, 2017 UT 34, 398 P.3d 1032. "Although courts must consider all legally relevant factors in making a sentencing decision, not all aggravating and mitigating factors are equally important, and one factor in mitigation or aggravation may weigh more than several factors on the opposite scale." *Id.* (cleaned up). "Thus, several mitigating circumstances claimed by a defendant may be outweighed by a few egregious aggravating factors." *Id.* "Absent statutorily articulated aggravating and mitigating circumstances in noncapital cases, courts have historically based

their sentencing decisions on the totality of the circumstances." *State v. Perea*, 2013 UT 68, ¶ 117, 322 P.3d 624.

¶41 Levering argues that the trial court "failed to consider mitigating factors raised at sentencing," specifically the eight-year gap when he had no criminal charges. But the trial court did consider this mitigating factor. The court acknowledged Levering's "eight-year period of no legal problems" but then noted that since moving to St. George, Levering had cases almost yearly. After listing these cases, the court stated, "[Y]ou're not a clean one-owner here. Your life has been spent in violation of the law. And at some point, society should be protected from someone who acts, I believe, like you have." The court accordingly sentenced Levering to five years to life in prison.

¶42 The court did not "ignore[]" the mitigating factors, as suggested by Levering. Rather, it considered them and found that they were outweighed by the aggravating factors. *See Killpack*, 2008 UT 49, ¶ 59. And based on these aggravating factors, the court determined that Levering should be sentenced to prison. Therefore, we affirm Levering's sentence.

CONCLUSION

¶43 Levering has not demonstrated that the issues he presented on appeal warrant reversal. Accordingly, we affirm.

———————